UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BOBBIE J. ELLIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 04 C 7708 |
| v. ) | |
| ) | Judge George M. Marovich |
| JO ANNE B. BARNHART, COMMISSIONER ) | |
| OF THE SOCIAL SECURITY ADMIN., ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Bobbie J. Ellis ("Ellis") filed this action to appeal a final administrative decision denying her application for Supplemental Security Income disability benefits. Plaintiff and defendant have filed cross-motions for judgment on the administrative record. For the reasons set out below, the Court denies the plaintiff's motion and grants defendant's motion.

**I.  Background**

On August 16, 2001, Ellis applied to the Social Security Administration ("SSA") for Supplemental Security Income ("SSI") on the basis of disability. In her application, Ellis stated that she became disabled on June 13, 2001." (R. 130). As of the date of the hearing, Ellis was a 46-year-old woman. (R. 30).

**Ellis's educational background and work experience**

Ellis completed the ninth grade and stayed in school until some point in the 10th grade. (R. 32).

Prior to applying for disability benefits, Ellis had worked in a few different positions. (R. 133). Ellis worked at several McDonald's restaurants at times during the years 1986-1989 and

1998. (R. 133-135). At McDonald's, Ellis worked as a cook. (R. 36). The position sometimes required Ellis to lift more than 20 pounds. (R. 79).

Ellis also worked as a school bus aide for the local Board of Education for periods of time during the years 1991-2001. (R. 134-135). She started that position when her son began kindergarten, and she continued in that position for about ten years. (R. 34). Ellis was responsible for assisting special education students on and off the bus, across streets and into their seatbelts. (R. 35). As bus aide, Ellis was paid for four hours of work each day. (R. 68). Ellis spent the remainder of the day volunteering at the school in the lunchroom or in classrooms as needed. (R. 68-69). Ellis stopped working as a bus aide in June 2001, although the circumstances of the termination of her employment are not clear from the record. (R. 67).

Since June 2001, Ellis has tried but has been unable to find another job. (R. 74-75). She believes her lack of a high school diploma and health problems might have discouraged potential employers from hiring her. (R. 75). Ellis does not want to babysit or "keep" children. (R. 75).

**Ellis's physical condition**

*Ellis's description of her impairments*

Ellis has described the illnesses and/or injuries that she claims affect her ability to work. In her application interview, she stated that her ability to work was affected by congestive heart failure, an enlarged heart, shortness of breath and pain in her legs and eyes. (R. 141). Ellis stated that the symptoms first surfaced in January of 1999 and rendered her unable to work by June 13, 2001. (R. 141).

Ellis elaborated on these symptoms at a hearing before the Administrative Law Judge (the "ALJ"). At the hearing, Ellis testified that she suffers shortness of breath if she sweeps or tries to

walk. (R. 37-38). Ellis believes this is caused by an enlarged heart. (R. 42). Ellis testified that the breathing is helped somewhat by her medication. (R. 70). Ellis also testified that her ability to work is affected by menopause in that she suffers hot flashes, mood swings and a desire not to be around people. (R. 38). Sometimes, the backs of Ellis's legs hurt. (R. 38-39). Ellis attributes the leg pain to the fact that doctors thread something through her leg veins when they were repairing her heart. (R. 44). Ellis experiences the leg pain during her menstrual cycle. (R. 44). In addition, Ellis's vision is sometimes blurry, and she needs reading glasses to correct it. (R. 39). Ellis believes her blurred vision is a side effect of the medication she has taken since 1999. (R.45). Ellis testified that her vision blurs after about half an hour of reading or television watching. (R. 46). In addition, Ellis sometimes has difficulty sleeping because of her labored breathing. (R. 60).

Ellis also testified about her abilities. She testified that she is able to walk for about ten or fifteen minutes before becoming short of breath. (R. 51). Out of an eight-hour workday, Ellis estimates that she could walk about an hour. (R. 52). Ellis prefers walking to standing. (R. 53). She would also prefer not to sit for "too long" because that causes stiffness. (R. 53). Out of an eight-hour day, Ellis estimates that she could sit for about one or two hours. (R. 53-54).

*The medical evidence of Ellis's impairments*

In or about June 1999, Ellis was hospitalized for a heart problem. The administrative record contains no records from that hospitalization, but it contains records of follow-up visits. On or about December 2, 1999, Allen S. Anderson, M.D. ("Dr. Anderson") described the original hospitalization for heart failure and the follow-up. In June 1999, Ellis presented with atrial tachycardia, which caused an excessive heart rate of between 140 and 170 beats per minute. Ellis

was also experiencing pericardial effusion (excessive fluid in the pericardial sac surrounding the heart). Dr. Anderson's notes reflect that Ellis "ultimately underwent ablation of this tachycardia without complication" and "remained asymptomatic throughout her hospitalization and never experienced palpitations." (R. 192). As of the December 1999 follow-up visit, Ellis had "had no cough . . . or shortness of breath." As for Ellis's enlarged heart, by December 1999, Dr. Anderson noted:

> Normal ventricular size and systolic performance were noted as well as a decrease in the mitral and tricuspid insufficiency. The *pericardial effusion persisted but was trivial* and seen mostly posteriorly.

(R. 194) (emphasis added). Finally, Dr. Anderson noted that Ellis "seems to have had good return to her left ventricular systolic function" and that the doctors would "gradually discontinue some of her medications and monitor her left ventricular performance." (R. 194-195).

Ellis returned for several cardiology follow-up appointments. On March 2, 2000, Ellis told the doctor that she felt good but occasionally experienced shortness of breath in the evenings. She also told doctors she was sleeping well and sleeping flat. At her September 17, 2001 cardiology appointment, Ellis told the doctor that she had no problems doing housework.

On or about November 6, 2001, Ellis was sent by the Illinois Department of Rehabilitation Services Bureau of Disability Determination for a medical evaluation with G. Chadha, M.D. ("Dr. Chadha"). (R. 186-191). Ellis told Dr. Chadha that she was experiencing shortness of breath with exertion, pain in her left shoulder, leg swelling and hot flashes. (R. 186-187). Dr. Chadha found no tenderness in Ellis's left shoulder and found her range of motion to be normal. (R. 189). Dr. Chadha found that Ellis's complaints about hot flashes and mood swings were "possible post-menopausal syndrome." (R. 189).

On or about December 13, 2001, Ellis submitted to a residual functional capacity assessment signed by James Graham, M.D. ("Dr. Graham"). (R. 191A-191H). Dr. Graham

concluded that Ellis could: 1) frequently lift 25 pounds and occasionally lift 50 pounds; 2) stand or walk about six hours in an eight-hour workday; 3) sit about six hours in an eight-hour workday; 4) frequently climb ramps/stairs, balance, stoop, kneel, crouch and crawl; 5) occasionally climb ladders and scaffolds; and 6) never climb rope. Dr. Graham concluded that Ellis had no limitations with respect to manipulation (i.e., reaching, fingering, handling), vision, communication or environment (except that Ellis should avoid concentrated exposure to heights).

On March 6, 2003, Dr. Anderson filled out a cardiac residual functional capacity questionnaire for Ellis. (R. 220-223). Dr. Anderson noted that Ellis had "had severe heart failure previously, which has almost completely resolved with treatment." (R. 223). He stated that her diagnosis was tachycardia-mediated cardiomyopathy and that her prognosis was good. By that time, Ellis's cardiac functioning was improved and her heart was only mildly enlarged. (R. 220). Dr. Anderson's analysis was that Ellis: (1) was not limited in her ability to work without rest or pain; (2) did not need a job requiring unscheduled breaks or that permitted shifting of positions at will; (3) could frequently lift fewer than ten pounds, occasionally lift ten or 20 pounds and rarely lift 50 pounds; (4) was capable of sitting for at least six hours of an eight hour day; and (5) was capable of standing for at least six hours of an eight hour day. Ultimately, Dr. Anderson concluded that Ellis was capable of low stress work.

**Procedural history**

Ellis's claim for SSI disability benefits has been denied by the Social Security Administration. Her claim was initially denied on or about December 31, 2001. (R. 104-107). In denying the application, the Social Security Administration noted:

> The medical evidence in [sic] file shows that your condition does cause some restrictions in your ability to function. However, based on your description of the

> job of bus aide, we have concluded that you have the ability to return to that type of work.
>
> We have determined that your condition does not keep you from working. We considered the medical and other information, your age, education, training and work experience in determining how your condition affects your ability to work.

(R. 107).

Ellis requested a hearing, which was held on March 10, 2003. At the hearing, the ALJ sought the testimony of a vocational expert, Thomas Dunleavy ("Dunleavy"). Dunleavy is licensed in the State of Illinois, is Board Certified in rehabilitation counseling and runs a private practice assisting individuals in determining whether they can return to work. (R. 75-76). Ellis's attorney did not object to Dunleavy's testifying as an expert at the hearing.

The ALJ posed several hypothetical questions to the vocational expert. First, the ALJ asked Dunleavy to assume a hypothetical 43-year-old with a ninth-grade education who could lift ten pounds, who could carry file folders, tools and ledgers and who could stand occasionally. The ALJ asked whether that hypothetical individual would be capable of performing any of Ellis's prior work. (R. 83-84). The vocational expert opined that such an individual could not perform the past work because the past work would be considered light duty work. (R. 84).

The ALJ then asked whether other jobs existed in the regional or national economy that the hypothetical individual could perform and, if so, whether Dunleavy could provide some examples. (R. 84). The vocational expert opined that the hypothetical individual could perform several sedentary jobs, such as cashier (of which there are at least 2,000 jobs), small parts assembler (8,000 jobs) or packager (4,000 jobs). (R. 84).

The ALJ then changed the hypothetical. The ALJ asked the vocational expert to consider an individual who was the same except that she would have blurred vision that would preclude reading or close work. (R. 85). The vocational expert testified that the hypothetical person could still perform the production jobs, which the vocational expert said are sometimes called "blind assembly" jobs because they do not require close reading. (R. 85). The vocational expert also said the hypothetical person could perform the cashier work because handling paper money does not require fine reading. (R. 85).

Next, the ALJ asked the vocational expert whether he agreed that the hypothetical person would be precluded from full-time work if she could not stand or walk for more than an hour and could not sit for more than an hour. The vocational expert agreed. (R. 85-86). Finally, the ALJ asked the vocational expert whether he agreed that the hypothetical person would be precluded from work if she could maintain concentration only 60% of the day. (R. 86). The vocational expert agreed. (R. 86).

Ellis's attorney cross-examined the vocational expert. Ellis's attorney asked whether the number of sedentary jobs (the 2,000 cashier jobs, the 8,000 small parts assembly jobs and the 4,000 packaging jobs) the expert mentioned in response to the first hypothetical accounted for the fact that Ellis had an environmental restriction against extreme heat, extreme cold and dust. (R. 87-88). The vocational expert said that he had taken that into account. (R. 88). Specifically, the vocational expert said that the number of cashiers was not affected by the environmental restriction. (R. 88). He added that but for the environmental restriction, the number of assembly positions available would have gone up to 9,000 to 10,000 and the number of hand packagers would have gone up to 5,000 to 6,000. (R. 88).

Ellis's attorney then asked whether the numbers came from "the Illinois Statistic, the Employment Quarterly publication that comes out with numbers[.]" The vocational expert stated that he "had to extrapolate on that. Because there aren't any–no, no publications give you sedentary job levels, or they don't break it down by exertions. So we as vocational experts, have to rely on our experience, the–starting with the base line of the state figures and then going from there." (R. 89). Ellis's attorney asked no questions about the vocational expert's methodology for extrapolating the number of sedentary jobs from the base-line published figures. (R. 89-91).

On September 25, 2003, the ALJ issued an opinion denying Ellis's request for Supplemental Security Income disability benefits. Ellis filed a request for review with the Appeals Council, which denied her request for review. The ALJ's decision, thus, became the final decision of the Commissioner of Social Security (the "Commissioner"). Ellis filed an action in this Court for review of that decision. Both parties have moved for summary judgment.

## II. Standards

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

An individual denied Social Security benefits by the Commissioner of the Social Security Administration may seek review at the district court. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" *See* 42 U.S.C. § 405(g). This Court's review is limited to determining whether the ALJ's decision is "both supported by substantial evidence and based on the proper legal criteria." *Scheck v. Barnhart*, 357 F.3d 697, 698 (7th Cir. 2004). Substantial evidence is that which a reasonable mind would accept as support of a conclusion. *Id.* If the ALJ's decision is supported by substantial evidence, it "will be upheld even if an alternative position is also supported by substantial evidence." *Scheck*, 357 F.3d at 698 (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

### III. Discussion

The standards for supplemental security income are "materially the same" as the standards for Social Security. *Donahue v. Barnhart*, 279 F.3d 441, 443 (7th Cir. 2002). To qualify for disability benefits under the Social Security Act, one must, among other things, be under a "disability," which is defined under the Act as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months

42 U.S.C. §§ 423(a)(1)(D); 423(d)(1). As the Seventh Circuit has explained, "supplemental security income is not a form of unemployment insurance and is unavailable if any do-able work exists in the national economy, even if other persons with better skills are likely to be hired instead." *Donahue*, 279 F.3d at 443.

In determining whether a claimant is disabled, the ALJ must consider whether:

(1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe v. Barnhart*, 425 F.3d 345, 351-352 (7th Cir. 2005) (citing 20 C.F.R. §§ 404.1520, 416.920). The claimant has the burden of proof with respect to steps one through four, and the burden shifts to the Commissioner with respect to step five. *Briscoe*, 425 F.3d at 352. A finding of disability "requires an affirmative answer at either step three or step five." *Briscoe*, 425 F.3d at 352. "A negative answer at any point, other than Step 3, stops the inquiry and leads to a determination that the claimant is not disabled." *Porter v. Bowen*, Case No. 8190, 1989 WL 153000 at * 2 (N.D. Ill. 1989) (citing 20 C.F.R. § 416.920).

Here, the ALJ applied the proper legal standard when he considered the five steps set out in the regulations. (R.16-22). The Court next considers whether the ALJ's factual findings are supported by substantial evidence.

*Whether Ellis was employed*

At step one, the ALJ's conclusion that Ellis was not employed was supported by substantial evidence, most notably Ellis's testimony that she had not worked in several years. (R. 67).

*Whether Ellis had a severe impairment*

At step two, the ALJ considers whether the claimant has a severe impairment. A severe impairment is one that "significantly" limits the claimant's "physical or mental ability to do basic

work functions," such as walking, standing, lifting, hearing, understanding and judging. *See* 20 C.F.R. § 416.921. At step two, the ALJ concluded that Ellis "has cardiomyopathy, tachycardia-mediated and enlarged heart, impairments considered 'severe' based on the requirements in the Regulations 20 C.F.R. § 416.920(b)." (R. 23).

The Court fails to see how the ALJ's finding that Ellis had a severe impairment is supported by substantial evidence. All the ALJ says to support his finding is that Ellis was diagnosed with tachycardia-mediated cardiomyopathy and enlarged heart. The diagnosis alone is insufficient (particularly where, as here, the ALJ concluded that the diagnosis is not on the list of impairments automatically considered to be severe). Were a diagnosis alone sufficient, the requirement that the impairment last for twelve months would effectively be written out of the statutory definition of disability. The evidence shows that in June 1999, the tachycardia caused Ellis to suffer an excessive heart rate of between 140 and 170 beats per minute, but the doctors corrected the problem. By December 1999, any remaining enlargement of the heart was considered "trivial" by Ellis's cardiologist. Ellis was still working two years after the initial diagnosis. In addition, two functional capacity examinations (including one by Ellis's cardiologist) suggest that Ellis does not have a severe impairment. The ALJ may have relied on other (perhaps substantial) evidence in concluding that Ellis was severely impaired but that should have been explained in the ALJ's decision.

Still, it is unnecessary for the Court to remand this matter for further proceedings with respect to step two, because, as will become clear later in the opinion, such a remand would not change the outcome. Any error with respect to step two was harmless.

*Whether Ellis had an impairment listed as severe in the regulations*

With respect to step three, the ALJ concluded that Ellis's impairments do not equal any of the impairments listed (in Appendix 1 to the regulations) as being so severe as to preclude substantial gainful activity. The Court agrees that Ellis's impairments do not meet or equal any listed in Appendix 1. For these reasons, the Court will not disturb the ALJ's findings with respect to step three.

*Whether Ellis can perform her prior work*

With respect to step four, the ALJ concluded that Ellis could not return to her previous work as a bus aide or as a cook at McDonald's. This was based on his conclusion that Ellis could perform only sedentary work (which requires less exertion than does light work), while Ellis's previous jobs were light work. This conclusion was based, at least in part, on the testimony of the vocational expert, who opined that Ellis could not return to her previous work. Although the Court might not have reached the same decision, the decision is based on substantial evidence, and the Court will not disturb it.

*Whether Ellis can perform other work*

At step five, the Commissioner has the burden of establishing the existence of jobs in the economy that the claimant can perform. *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004). In so doing, the ALJ or Commissioner can rely on the testimony of a vocational expert, but the vocational expert's opinions, though not required to meet the standards of Rule 702 of the Federal Rules of Evidence, must be reliable. *McKinnie*, 368 F.3d at 909; *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("Rule 702 does not apply to disability adjudications . . . [b]ut

the idea that experts should use reliable methods . . . plays a role in the administrative process because every decision must be supported by substantial evidence.").

An ALJ "is entitled to accept the vocational expert's conclusion;" but, if "the basis of the vocational expert's conclusions is questioned at the hearing, . . . then the ALJ should make an inquiry (similar though not necessarily identical to that of Rule 702) to find out whether the purported expert's conclusions are reliable." *Donahue*, 279 F.3d at 446. In *McKinnie*, the Seventh Circuit remanded for further proceedings a case in which the ALJ failed to inquire into the reliability of a vocational expert's conclusion after it was challenged by the claimant. *McKinnie*, 368 F.3d at 911. At the hearing, the vocational expert testified that a hypothetical person similar to the claimant could perform some 10,000 jobs in the local economy. When asked how she reached the conclusion, she testified that she extrapolated the numbers from market studies, labor statistics and her knowledge of the labor market. When asked how she performed the calculations, the vocational expert, who had not prepared a written report and who could not provide data or citations, said it was "[b]ased on our knowledge of the vocational expert and every day labor market surveys that we do[.]" The ALJ made no further inquiry. The Seventh Circuit remanded, explaining that "[w]ithout first inquiring into the reliability of [the vocational expert's] opinions, the ALJ should not have so unquestioningly accepted her testimony that a significant number of jobs were available to [the claimant]." *McKinnie*, 368 F.3d at 911.

Ellis argues that in her case the ALJ was not allowed to rely on the vocational expert's testimony because the vocational expert used the word "extrapolate." (Plaintiff's Brief at 8). Ellis misreads *McKinnie* and *Donahue*. In *Donahue*, the Seventh Circuit explicitly said it was

okay for an ALJ to rely on a mere conclusion if the foundation of that conclusion had not been challenged. *Donahue*, 279 F.3d at 446 ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion"). The problem in *McKinnie* was not that she "extrapolated" numbers of jobs, it was that she was unable to explain the calculation when she was asked about it. In this case, it is true that Ellis's attorney cross-examined the vocational expert, but stepping up to cross-examine a witness is not the same as challenging the foundations of that witness's testimony. When Ellis's attorney asked the expert whether he had accounted for environmental restrictions, he said that he had, where necessary. Ellis's attorney also asked whether he relied on numbers in particular statistical reports. The expert responded that he had but that he had to extrapolate which jobs were sedentary because the publications did not break down the numbers by level of exertion. Ellis's attorney never, however, asked the expert how he extrapolated which jobs were sedentary, and the expert was never unable to provide an answer to the questions asked. This case is not like *McKinnie*, where the attorney asked how the numbers were calculated and the expert was unable to provide either the numbers or the methodology. Because Ellis never challenged the foundation of the expert's extrapolation at the hearing, the ALJ was entitled to rely on the vocational expert's testimony without further inquiry.[1]

Furthermore, the ALJ's decision is supported by substantial evidence because the hypothetical the ALJ posed to the vocational expert was based on his conclusion as to claimant's

---

[1]The Court will not consider plaintiff's argument that the vocational expert's testimony conflicted with "information supplied by the DOT." That information is not in the administrative record, and this Court's review is limited to information in the administrative record.

capabilities, which, in turn, was based on substantial medical evidence and claimant's testimony.

The ALJ made the following findings with respect to Ellis's capabilities:

> She is able to perform sedentary exertion, with lifting limited to 10 pounds occasionally and lifting of file folders frequently, with standing and walking and climbing, balancing, stooping, kneeling, crouching and crawling all limited to occasionally, and she must avoid even moderate exposure to extreme cold, extreme heat, fumes, odors, gases, and work at heights or around dangerous machinery. The individual also has periods of blurred vision, which would preclude close up work and reading for more than 1 hour.

(R. 21). The hypothetical incorporated these findings. (R. 83-84, 87-88). Furthermore, these findings are supported by the functional capacity evaluations (particularly that of Ellis's treating cardiologist, to which evaluation the ALJ gave extra weight) even though the ALJ's findings are actually *stricter* than those imposed by the functional capacity evaluators.

The final decision of the Commissioner of the Social Security Administration is supported by substantial evidence.

## IV.  Conclusion

For the reasons set forth above, the Court denies plaintiff's motion for judgment. The Court grants defendant's motion for judgment.

ENTER:

*[signature: George M. Marovich]*

George M. Marovich
United States District Judge

DATED: 04/07/06